

# In the
# Missouri Court of Appeals
## Western District

SPRINT LUMBER, INC., SCOTT
LADEROUTE, JERRY DOWNEY,
SHEILA HIGDON, JESS REYNOLDS,
AND RAY MENG,

        **Appellant-Respondents,**

v.

UNION INSURANCE COMPANY,
CONTINENTAL WESTERN GROUP,
LLC.,

        **Respondent-Appellants.**

**WD82930 Consolidated with
WD82939**

**OPINION FILED:**

**April 6, 2021**

---

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable James F. Kanatzar, Judge**

**Before Division One:
Alok Ahuja, P.J., Thomas H. Newton, and Thomas N. Chapman, JJ.**

This appeal and cross-appeal arise from the judgment of the Circuit Court of Jackson

County on Sprint Lumber, Inc., its owner and president, and certain employees' (collectively

"Sprint Lumber Parties") claims against Union Insurance Company and Continental Western

Group LLC (collectively "Union") for declaratory judgment, breach of contract, and breach of

fiduciary duty involving Union's duty to defend and indemnify them under a commercial general

liability policy in a federal lawsuit brought by a competitor. The Sprint Lumber Parties raise

three points on appeal challenging the trial court's partial summary judgment in favor of Union

on their claim for breach of fiduciary duty and the trial court's calculation of damages.  In its cross-appeal, Union raises five points challenging the trial court's partial summary judgment in favor of the Sprint Lumber Parties finding Union had a duty to defend and its judgment against Union to indemnify the Sprint Lumber Parties.  The judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Sprint Lumber, Inc. ("Sprint Lumber") and Porters Building Centers, Inc. ("Porters") are competitors in the lumber and building supplies business in Northwest Missouri and Northeast Kansas.  Scott Laderoute ("Laderoute") is the owner of Sprint Lumber.  Jerry Downey ("Downey"), Sheila Higdon ("Higdon"), Jess Reynolds ("Reynolds"), and Ray Meng ("Meng") (collectively "Former Employees") are former Porters employees who left Porters for Sprint Lumber in 2016.  Union issued a commercial general liability policy ("Policy") to Sprint Lumber for the period of October 1, 2015, to October 1, 2016, policy number CPA 3109148-20.[1]  The Policy provided coverage for bodily injury and property damage liability and personal and advertising injury liability.

On May 9, 2016, Porters filed suit against Sprint Lumber, Laderoute, Downey, Higdon, Reynolds, and Meng (again collectively "Sprint Lumber Parties") in the United States District Court for the Western District of Missouri ("Underlying Suit").  The Underlying Suit sought damages and injunctive relief for violation of the Computer Fraud and Abuse Act, violation of the Missouri computer tampering statutes, violation of the Missouri Uniform Trade Secrets Act, breach of restrictive covenants, breach of duty of loyalty, tortious interference with business

---

[1] Continental Western Group, LLC ("CWG") handles claims made on Union Insurance Company's ("UIC") policies including the claim made on the Policy in this case.

2

expectancy, and civil conspiracy. Porters alleged that while still employed by Porters, Former Employees conspired with Sprint Lumber and Laderoute to misappropriate, and then delete from Porters's systems, Porters's proprietary information, trade secrets, and customer contact information and lists. It further alleged that Former Employees "affirmatively undercut" Porters's business as they directly competed against Porters and worked to solicit Porters's customers for Sprint Lumber. The same day, Porters also filed a motion for temporary restraining order and request for preliminary injunction to prevent further irreparable injury and to maintain the status quo during the pendency of the litigation.

On May 23, 2016, Porters filed a first amended petition, which included the seven claims from the original petition and added an antitrust claim under the Sherman Act and a trespass claim. The antitrust claim alleged that the Sprint Lumber Parties intended to put Porters out of business and to monopolize the industry in St. Joseph and the surrounding region.

The Sprint Lumber Parties notified Union of their claim for coverage and sent it Porters's original petition in the Underlying Suit on May 17, 2016. On May 18, 2016, at 10:50 a.m., Laura Williams ("Williams"), a CWG claims adjuster, opened a claim for the Underlying Suit. By 2:34 p.m. that same day, Williams concluded that "no coverage is afforded under this coverage form. Based on the above, no coverage is available under this policy." On May 25, 2016, Union received Porters's first amended petition. On June 13, 2016, Williams sent a disclaimer letter to Sprint Lumber and its attorney stating that Union "will not make any defense or indemnity payment under your policy because there is no coverage for this loss." Specifically, the letter stated that Porters's allegations did not meet the definition of "personal and advertising injury" in the Policy and that even if such coverage was triggered, exclusions in the Policy precluded coverage. Williams's supervisor, Brandon Fahey ("Fahey") approved the letter.

3

On October 14, 2016, Porters filed a second amended petition, which reasserted all of the prior claims except for breach of restrictive covenants, which was dropped. Five days later on October 19, 2016, Porters filed a second motion for preliminary injunction. Union received Porters's second amended petition on November 28, 2016, and Williams reopened the claim on December 5, 2016. Fahey reviewed the second amended petition on January 10, 2017, and decided that there was no coverage and no duty to defend. Williams sent a second disclaimer letter to Sprint Lumber and its attorney on January 23, 2017, again disclaiming coverage for the claim.

On October 3, 2017, Sprint Lumber and Laderoute's attorney sent a letter to Williams to present additional materials relevant to demonstrating coverage under the personal and advertising coverage of the Policy, specifically, Sprint Lumber's motion for summary judgment and the pleadings and exhibits on the motion from the Underlying Suit and the court's order denying most of the motion. The letter also notified Williams about the jury trial scheduled in the Underlying Suit for December 4, 2017, and reiterated a demand for a defense and indemnification. Following receipt of the October 3, 2017 letter, Williams requested an explanation of why coverage is afforded under the Policy. On October 13, 2017, counsel for Sprint Lumber and Laderoute sent a nine-page letter to Williams explaining that there was coverage under the personal and advertising portion of the Policy and that none of the exclusions in the Policy defeated coverage. Again, the letter demanded that Union provide a defense, reimburse for attorney fees and expenses incurred, and provide coverage under the Policy for any judgment or settlement that may be entered or reached in the Underlying Suit.

On November 2, 2017, Union's attorney wrote to counsel for Sprint Lumber and Laderoute extending Union's offer to defend them in the Underlying Suit under a reservation of

4

rights. Counsel for Sprint Lumber and Laderoute responded with a letter the same day rejecting the offer to defend under reservation of rights and demanding a defense without reservation. The letter also indicated that Porters was willing to settle for an amount "well into the $700,000s" but that a settlement had to be reached that day. The letter further explained that Porters was claiming lost profit damages in the range of $1,550,000 to $2,000,000; that there was damaging evidence of the Sprint Lumber Parties' disparaging Porters to steer its customers away to Sprint Lumber and providing Sprint Lumber with Porters's confidential information; and that there was a significant risk of a verdict exceeding $2,000,000, not including punitive damages.

Later on November 2, 2017, the Sprint Lumber Parties reached an agreement with Porters to settle the Underlying Suit. Counsel for Sprint Lumber and Laderoute informed Union's attorney of the settlement that day stating, part:

> As we previously explained and made clear, time was of the essence and Porters placed a deadline on settlement discussions of today. In order to protect our clients' best interests and to protect from an excess judgment with a punitive damage component that would have been devastating to your insureds, we were forced to settle this case.
>
> We hereby demand immediate reimbursement of all attorney fees and expenses incurred in the defense of this matter and full indemnification for the settlement.

Sprint Lumber and Laderoute paid Porters $775,000 to settle the Underlying Suit. Union refused the demand for reimbursement of attorney fees and expenses incurred in defending the Underlying Suit and for indemnification of the settlement.

On October 25, 2017, Sprint Lumber Parties filed the instant lawsuit against Union. Their second amended petition asserted three claims. Count I sought a declaration that the Policy's personal and advertising injury coverage provided coverage to the Sprint Lumber Parties and that Union wrongfully refused to provide coverage and a defense. Count II alleged

5

breach of contract for Union's refusal to provide coverage under the Policy and sought damages and statutory penalties and attorney fees under Missouri's vexatious refusal statutes. Count III alleged breach of fiduciary duty for Union's refusal to defend the Sprint Lumber Parties in the Underlying Suit and to pay Porters a settlement within the Policy limits and sought compensatory and punitive damages.

The parties filed cross-motions for summary judgment addressing whether Union had a duty to defend and indemnify the Sprint Lumber Parties in the Underlying Suit. On March 29, 2019, the trial court entered partial summary judgment in favor of the Sprint Lumber Parties on Counts I and II (declaratory judgment and breach of contract) of their second amended petition. It found that Union had a duty to defend the Sprint Lumber Parties in the Underlying Suit and that Union breached that duty. It further found that the record was insufficient on the question of Union's duty to indemnify and damages and ordered that the case proceed to trial on those issues. The trial court also entered partial summary judgment in favor of Union on Count III (labeled by the Sprint Lumber Parties as a claim for "breach of fiduciary duty").

A bench trial was held on the remaining issues, and on May 21, 2019, the trial court entered its final judgment. The trial court incorporated its March 29, 2019 partial summary judgments into the final judgment. It further concluded that Union had a duty to defend the Sprint Lumber Parties in the Underlying Suit as of June 13, 2016, the date of Union's first disclaimer letter and that Sprint Lumber and Laderoute were entitled to damages flowing from the breach of the duty to defend of $398,531 paid to Sprint Lumber and Laderoute's attorneys and $276,993 paid to Downey, Higdon, Reynolds, and Meng's attorneys for work performed after June 13, 2016, in defending them in the Underlying Suit. The trial court also found that there was coverage under the Policy for the Sprint Lumber Parties' settlement with Porters and

6

that Union had a duty to indemnify Sprint Lumber and Laderoute for $775,000, the amount they paid to Porters to settle the Underlying Suit, along with interest and fees of $52,357, which had been paid in connection with a loan taken out to finance the settlement. Furthermore, the trial court concluded that Union's handling of the claim and its refusal to pay the settlement amount was vexatious and without reasonable cause or excuse. It found that Sprint Lumber and Laderoute were jointly entitled to $77,500 from Union as a penalty under the vexatious refusal statutes for Union's failure to pay the settlement amount. It found that, although Union's failure to defend was also vexatious, it was constrained by Missouri law to limit its application of the penalty to only the settlement amount. Finally, the trial court found that Sprint Lumber and Laderoute were entitled to reasonable attorney fees from Union incurred in pursing this case in the amount of $193,841.[2]

This appeal by the Sprint Lumber Parties and cross-appeal by Union followed. For organizational purposes, Union's cross-appeal is addressed first. Additional relevant factual and procedural background is presented below in the discussion of the parties' points on appeal.

## UNION'S CROSS-APPEAL

Union raises five points in its cross-appeal. In points one and two, it challenges the trial court's grant of partial summary judgment in favor of the Sprint Lumber Parties on the issue of Union's duty to defend. In points three, four, and five, Union challenges the judgment against it to indemnify for the settlement reached in the Underlying Suit.

---

[2] Finding no evidence that Downey, Higdon, Reynolds, and Meng incurred any monetary damages or attorney fees resulting from the Underlying Suit, the trial court did not award any of the damages or fees to them.

**Summary Judgment of Duty to Defend**

In points one and two, Union contends that the trial court erred in entering partial summary judgment in favor of the Sprint Lumber Parties on the issue of Union's duty to defend.[3] It asserts that the trial court misapplied the law because (1) there was no possibility for coverage under the Policy for personal and advertising injury and (2) even if there were facts alleged in the complaint in the Underlying Suit for personal and advertising injury, coverage was excluded under two exclusions in the Policy.

Appellate review of the grant of summary judgment is *de novo*. *Green v. Fotoohighiam*, 606 S.W.3d 113, 115 (Mo. banc 2020). The reviewing court applies the same criteria as the trial court in determining whether summary judgment was proper. *Id.* Summary judgment is proper if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.* Facts contained in affidavits or otherwise in support of a party's motion for summary judgment are accepted as true unless contradicted by the non-moving party's response to the motion. *Id.* The record is reviewed in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. *Id.*

---

[3] The Sprint Lumber Parties filed a motion for summary judgment and Union filed a cross-motion for summary judgment on the issue of Union's duty to defend. In entering its partial summary judgment on the issue, the trial court granted in part the Sprint Lumber Parties' motion for summary judgment. In its points one and two, Union specifically contends that the trial court erred in granting partial summary judgment in favor of the Sprint Lumber Parties and against it on its cross-motion for summary judgment. "Generally, an order denying a party's motion for summary judgment is not a final judgment and is therefore not subject to appellate review." *Ferguson v. St. Paul Fire & Marine Ins. Co.*, 597 S.W.3d 249, 254 (Mo. App. W.D. 2019) (internal quotes and citation omitted). "However, the denial of a motion for summary judgment may be reviewable when, as in this case, the merits of the motion for summary judgment are interwined with the propriety of an appealable order granting summary judgment to another party." *Id.* (internal quotes and citation omitted).

The interpretation of an insurance contract is a question of law given *de novo* review. *Doe Run Res. Corp. v. Am. Guarantee & Liab. Ins.*, 531 S.W.3d 508, 511 (Mo. banc 2017). When interpreting an insurance contract, the policy language is given its plain meaning, or the meaning that would be attached by an ordinary purchaser of insurance. *Id.* "If the policy language is clear and unambiguous, it must be construed as written." *Id.* A phrase is ambiguous only if it is "reasonably open to different constructions." *Id.* (internal quotes and citation omitted). "Courts may not create an ambiguity when none exists." *Id.*

"An insurer owes two distinct duties to its insured: a duty to indemnify and a duty to defend." *Allen v. Cont'l W. Ins. Co.,* 436 S.W.3d 548, 552 (Mo. banc 2014). The duty to defend is broader than the duty to indemnify. *Allen v. Bryers*, 512 S.W.3d 17, 31 (Mo. banc 2016). "The duty to defend arises only when there is a possibility or potential for coverage at the outset of the case." *Id.* "The duty to defend is determined by comparing the insurance policy language with facts: '(1) alleged in the petition; (2) the insurer knows at the outset of the case; or (3) that are reasonably apparent to the insurer at the outset of the case.'" *Id.* (quoting *Allen*, 436 S.W.3d at 553). "If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend." *Id*. (internal quotes and citation omitted). The insurer is not relieved of its duty to defend merely because the plaintiff in the underlying lawsuit pleaded its claims inartfully. *Allen*, 436 S.W.3d at 552-53. The duty to defend potentially insured claims arises even if claims beyond coverage may also be present. *Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 79 (Mo. App. W.D. 2005). "To extricate itself from the duty to defend the insured, the insurance company must prove that there is *no possibility* of coverage." *Bryers*, 512 S.W.3d at 31 (internal quotes and citation omitted).

9

The duty to defend does not depend simply on a comparison of the policy's coverage with the allegations in the pleadings against the insured; instead, a duty to defend may also be triggered by "the facts [the insurer] knew or could have ascertained from a reasonable investigation." *Truck Ins. Exch.*, 162 S.W.3d at 79. Thus, "even though the pleadings do not show coverage," a duty to defend may exist where a possibility of coverage is demonstrated by "known or reasonable ascertainable facts." *Id.* (internal quotes and citation omitted). "[T]he allegations contained within the petition alone are not the sole determinant of the duty to defend." *Trainwreck West Inc. v. Burlington Ins. Co.*, 235 S.W.3d 33, 42 (Mo. App. E.D. 2007). "[T]he insurer cannot ignore safely actual facts known to it or which could be known to it or which could be known from reasonable investigation." *Id.* (internal quotes and citation omitted).

### *Possibility of Coverage*

In point one, Union contends that the trial court misapplied the law in finding that it had a duty to defend because there was no possibility of coverage for "personal and advertising injury" under the Policy since the facts in the federal complaint had no relationship to (or sought damages for) any "personal and advertising injury." Specifically, Union asserts that all of the claims and damages in the Underlying Suit were based on allegations of knowingly misappropriating confidential information, trade secrets, and customer contacts, and that none of the alleged facts triggered coverage under subparts d, e, or f of the definition of "personal and advertising injury."[4]

Coverage B of the Policy applied to claims seeking damages for "personal and advertising injury":

---

[4] Union did not dispute at trial, and does not dispute in this appeal, that the Sprint Lumber Parties were insured under the Policy.

10

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.

The Policy had a personal and advertising injury limit of $1,000,000 for any one person or organization and an aggregate limit of $2,000,000. In addition, it provided excess liability coverage of $5,000,000 for personal and advertising injury.

> The Policy defined the term "personal and advertising injury" as follows, in pertinent part:

> Personal and advertising injury means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

> …

> d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

> e. Oral or written publication, in any manner, of material that violates a person's right to privacy;

> f. The use of another's advertising idea in your "advertisement[.]"

> In their motion for summary judgment, the Sprint Lumber Parties argued, in part, that Porters's allegations in the Underlying Suit included claims of disparagement of its goods, products, and services for which the Policy provided coverage under subpart d. In *McCormack Baron Management Services, Inc. v. American Guarantee & Liability Insurance, Co.*, 989 S.W.2d 168 (Mo. banc 1999), the Missouri Supreme Court considered almost identical policy language involving coverage for personal injury for the disparagement of a person's or organization's goods, products, or services. In that case, the insured was a real estate management company that hired a security guard service for one of its complexes. *Id.* at 169.

11

One of the service's employees was fired after the insured told the service that the employee had

been insubordinate by making complaints about the misconduct of another employee. *Id.* The

fired employee sued the insured and the security guard service. *Id.* He asserted a claim for

tortious interference with a contractual relationship against the insured, alleging that he was fired

as a direct result of the insured's statement to his supervisor. *Id.* The insurance company refused

to provide a defense for the insured, claiming that the policy did not cover the fired employee's

suit. *Id.* at 170.

The Missouri Supreme Court held that the insurance company had a duty to defend the

insured in the fired employee's action. *Id.* at 174. It defined "disparage" as "to lower in esteem

or reputation," "to diminish the respect for," "to lower in rank by actions or words," or "to speak

slightingly of." *Id.* at 171 (internal quotes and citation omitted). It further determined that

coverage for an offense that disparages a person's or organization's goods, products, or services

is not limited to the cause of action of disparagement or injurious falsehood, but can include a

claim for tortious interference with a contractual relationship. *Id.* at 171-72.

Under the definition of "disparage" endorsed in *McCormack*, the allegations against the

Sprint Lumber Parties in Porters's pleadings gave rise to the possibility that the Sprint Lumber

Parties caused customers to leave Porters through disparaging statements and conduct. In

Porters's original petition, filed on May 9, 2016, it described the "Nature of the Case":

> In this lawsuit, Porter seeks to protect its confidential information and trade
> secrets from continued misappropriation and unlawful use by Defendants, as well
> as obtain damages arising from Defendants' wrongful actions in soliciting its
> employees and customers and destroying its protected electronic information.
> These wrongful acts have taken place over the course of nearly five months
> through dozens of meeting and communications between Sprint Lumber and the
> Former Employees. Defendants conspired on how to "capture" Porters' sales,
> copy its confidential information and trade secrets, and thereafter "dump" that
> information from Porters' systems. All the while, the Former Employees

12

> continued to be employed by Porters—affirmatively undercutting its business as they collected regular paychecks—even remarking to Sprint Lumber during work hours that they "will be bearing gifts" and boasting that "[a] monopoly is great."

The petition alleged that Former Employees affirmatively undercut Porters's business as they directly competed against Porters and worked to solicit its customers for Sprint Lumber. It asserted that Former Employees were engaged in an "orchestrated effort" to "hamper" Porters's business and "raid" its employees and customers for Sprint Lumber. Porters further alleged that its customers were "repeat customers for which it had a reasonable, valid business expectancy and probable future business relationship" and that the Sprint Lumber Parties wrongfully interfered with that expectancy by "inducing or causing a breach of that relationship by undercutting Porters's business" through solicitation of Porters's customers. Porters alleged that much of the solicitation for Sprint Lumber occurred while Former Employees were still Porters's employees.

Porters filed a motion for temporary restraining order and request for preliminary injunction on the same day it filed its original petition. The motion made the same basic allegations as Porters's petition but added, "[The Sprint Lumber Parties'] actions continue to inflict substantial harm on Porters, including in the form of lost customer relationships, lost employees, lost information, and lost good will."

Porters later filed first and second amended petitions reasserting the allegations contained in the original petition. The first amended petition added an antitrust claim under the Sherman Act alleging that the Sprint Lumber Parties intended to put Porters out of business and to monopolize the industry in St. Joseph and the surrounding region. Additionally, the first amended petition specifically alleged that as a result of the conspiracy between the Sprint Lumber Parties, "Porters suffered damages, including lost revenue, good-will, and customer

13

relationships." In the second amended petition, Porters added the following sentence to its statement of the "Nature of the Case": "The conspiracy culminated in the Former Employees diverting [Porters's] sales and business and customer relationships to Sprint Lumber and harming [Porters's] good will and reputation—all before, during, and after their orchestrated transition from employment at Porters to employment at Sprint Lumber."

Five days after it filed its second amended petition, Porters filed a second motion for preliminary injunction. In it, Porters alleged, "The extent and timing of the Former Employees' departure—along with the coordinated bolstering of Sprint Lumber and undercutting of Porters by its manager and key salespeople—magnifies the reputational and goodwill injury to Porters. It further alleged that the Sprint Lumber Parties wrongfully interfered with business expectancies by "[c]hallenging Porters's ability to carry on its operation without the Former Employees" and "[c]onveying false information regarding the circumstances of the Former Employees departure in a way that casts negatively on Porters" to Porters's customers.

These allegations in Porters's pleadings supported the possibility that the Sprint Lumber Parties disparaged Porters's products, goods, or services. Contrary to Union's argument that the Underlying Suit contained only allegations of knowingly misappropriating confidential information, trade secrets, and customer contacts, a significant and separate part of Porters's case was that the Sprints Lumber Parties wrongfully solicited Porters's customers and attempted to put Porters out of business in order to monopolize the industry in the region. Such allegations were raised in Porters's general allegations and its breach of loyalty, tortious interference, civil conspiracy, and antitrust claims and were independent from the trade secret and confidential information claims and allegations.

14

The term solicit means "to ask for or to request some thing or action in language which convinces that the asking or requesting is being done in earnest and that the solicitor wants results." *Adian N. Baker & Co. v. Demartino*, 733 S.W.2d 14, 16 (Mo. App. E.D. 1987) (internal quotes and citation omitted). In the context of Porters's claims, solicitation required statements to be made to customers to persuade them to change their loyalty and patronage from Porters to Sprint Lumber. Porters's allegations raised the possibility that the Sprint Lumber Parties used words that operated to lower esteem or respect for Porters, its reputation, and its rank.

Porters's allegations that the Sprint Lumber Parties' conduct harmed its good will further supported the possibility of disparagement. Good will of a business is defined as "an intangible asset that attaches to a business as a result of such favorable factors as location, product superiority, reputation, and managerial skills" and "a reasonable expectancy of preference in the race of competition." *Hanson v. Hanson*, 738 S.W.2d 429, 433 (Mo. banc 1987) (internal quotes and citations omitted). Porters's allegations raised the possibility that the Sprint Lumber Parties' statements and conduct were disparaging to Porters, causing its customers to believe that it no longer possessed a favorable reputation or managerial skills. *See, e.g., JAR Laboratories LLC v. Great Am. E & S Ins. Co.*, 945 F.Supp.2d 937, 944 (N.D. Ill. 2013) (allegation in underlying complaint that insured's statements damaged the good will associated with the underlying plaintiff's product and diverted sales from it "bolster[ed] the conclusion that the allegedly misleading statements disparaged [the product].").

Union argues that "[n]one of the complaints allege any facts regarding, or claims for, or damages from slander, libel or disparagement." It further suggests that the misconduct alleged in the Underlying Suit amounted to nothing more than comparison-based advertising, which should not be covered, citing *Select Designs, Ltd. v. Union Mutual Fire Insurance Co.*, 674 A.2d 798,

15

804 (Vt. 1996).  In *Select Designs*, a plaintiff sued its competitor, the insured, alleging that the insured and its officers induced the plaintiff's sales manager to leave the plaintiff for employment with the insured, bringing with him proprietary information and using that information to induce the plaintiff's customers to break their contract with the plaintiff and enter into contracts with the insured.  *Id.* at 803-04.  Thereafter, the insured sought a declaration that its insurer owed it a duty to defend the action brought by the plaintiff under the personal injury coverage of the policy for disparaging a person's or organization's goods, products, or services.  *Id.* at 804.  The Vermont Supreme Court found that the plaintiff's complaint against the insured did not allege that the insured disparaged the plaintiff's products or services reasoning:

> For [the insured] to argue that [the sales manager] necessarily disparaged the goods and services of [the plaintiff] in soliciting business from [the plaintiff's] customers is to contend that all comparison-based advertising is actionable and that [the sales manager] necessarily went over the line of protected commercial speech.  Disparagement in this context does not simply mean comparing a competitor's product or service unfavorably with one's own, but must constitute an 'injurious falsehood' to be actionable.

*Id.*

The Missouri Supreme Court, however, specifically declined to follow *Select Design* in *McCormack*.  It found that *Select Design* was "directly contrary" to its decision that coverage for the disparagement of another's goods, products, or services does not turn on whether a specific cause of action such as defamation, libel, slander, or injurious falsehood is asserted against the insured.  *McCormack*, 989 S.W.2d at 171-72.

Furthermore, the allegations in the Underlying Suit were significantly different than those in the *Select Design* case.  Porters's allegations did not merely allege that the Sprint Lumber Parties' used its proprietary information to lure its customers away to Sprint Lumber.  The allegations went beyond ordinary product or service comparisons.  Porters alleged that the Sprint

16

Lumber Parties wrongfully solicited Porters's customers and acted to put Porters out of business altogether and to monopolize the contractor business in the region by harming Porters's relationship with its customers and its good will and reputation. Again, allegations of harm to Porters's good will and reputation bolstered the possibility that the Sprint Lumber Parties used statements that criticized and disparaged Porters's service. Furthermore, Porters specifically accused the Sprint Lumber Parties of questioning Porters's ability to carry on its business without the Former Employees and of making false statements to Porters's customers regarding the circumstances of the Former Employees' departure.

Porters's allegations against the Sprint Lumber Parties supported the possibility that the Sprint Lumber Parties caused customers to leave Porters through disparaging statements and conduct—that their statements and conduct had the effect of lowering the customers' esteem for Porters, diminishing Porters's reputation among customers, diminishing customers' respect for Porters, and lowering Porters's rank in the minds of customers. Beyond the allegations of Porters's pleadings, the facts which Union could have discovered through a reasonable investigation (which it never conducted) must also be considered in determining whether it had a duty to defend.[5] The trial court did not misapply the law in finding that there was a possibility of

---

[5] Although not alleged in the summary judgment pleadings, evidence was presented at the bench trial that Union (specifically the claims adjuster, Williams, and her supervisor, Fahey) did not investigate to determine what the Sprint Lumber Parties said to Porters's customers in soliciting them to leave Porters or how such solicitation occurred. Fahey specifically testified that in handling the claim, neither he nor Williams contacted the Sprint Lumber Parties, Porters, or their attorneys to ask for any additional information about the Underlying Suit. They never asked Downey, Reynolds, or Higdon what they said to Porters's customers to make them take their business to Sprint Lumber. As will be discussed under Union's point five below, Downey, Reynolds, and Higdon testified at the bench trial about what they told Porters's customers in their solicitation of them. Their statements to Porters's customers were reasonably discoverable from the outset of the case. Thus, even if Porters's pleadings alone did not support the possibility of coverage, and the trial court erred in entering partial summary judgment, sufficient evidence at trial supported Union's duty to defend based on the facts alleged in the petition and those Union knew or should have known at the outset of the case.

17

coverage for the disparagement of goods, products, or services under the "personal and advertising injury" coverage of the Policy and, thus, that Union had a duty to defend.

Because we have determined that there was a possibility of coverage and a duty to defend for injury arising out of the disparagement of Porters's goods, products, or services under subpart d of the definition of "personal and advertising injury," we need not address whether there was a possibility of coverage for injury arising out of the oral or written publication of material that violates Porters's right to privacy or the use of Porters's advertising idea in Sprint Lumber's advertisement in subparts e and f, respectively.

Point one of Union's cross-appeal is denied.

### *Coverage Not Excluded*

Alternatively, Union argues in point two that even if there were facts alleged in the complaint in the Underlying Suit for personal and advertising injury, coverage was excluded under two exclusions in the Policy—Infringement of Copyright, Patent, Trademark, or Trade Secret and Access or Disclosure of Confidential or Personal Information. Specifically, Union asserts that all of the facts alleged in the Underlying Suit centered on and sought damages for the wrongful and unlawful misappropriation and destruction of confidential information and trade secrets and the exclusions barred coverage for injuries arising out of such acts.

Exclusions are necessary provisions in insurance policies; and if they are clear and unambiguous within the context of the whole policy, they are enforceable. *Floyd-Tunnell v. Shelter Mut. Ins. Co.*, 439 S.W.3d 215, 221 (Mo. banc 2014). While the insured bears the initial burden of proving coverage, the insurer has the burden of demonstrating that an exclusion bars coverage. *Am. Family Mut. Ins. Co. v. Sharon,* 596 S.W.3d 135, 143 (Mo. App. W.D. 2020). "Because an insured purchases coverage for protection, the policy will be interpreted to grant

18

coverage rather than defeat it." *Id.* at 147 (internal quotes and citation omitted). Consequently, an exclusion is strictly construed against the insurer and in favor of the insured. *Id.*

Coverage B of the Policy provided several exclusions to which the insurance did not apply including:

> Infringement Of Copyright, Patent, Trademark Or Trade Secret
>
> "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".
>
> However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

Another exclusion under Coverage B was:

> Access Or Disclosure Of Confidential Or Personal Information
>
> "Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customers lists, financial information, credit card information, health information or any other type of nonpublic information
>
> This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

These exclusions did not eliminate the possibility of coverage for disparagement of Porters's goods, products, or services. Again, Union's argument under this point is based on its characterization that all of Porters's allegations in the Underlying Suit centered on and sought damages for the wrongful and unlawful misappropriation and disclosure of confidential information and trade secrets. That characterization, however, is far too sweeping. As discussed in point one, the Underlying Suit also involved the wrongful solicitation of its customers through the disparagement of Porters.

19

Union failed to demonstrate that the exclusion for the infringement of trade secrets or other intellectual property barred coverage for disparagement. The plain language of the intellectual property exclusion did not relate to the disparagement of Porters's goods, products, and services. Numerous cases have held that disparagement is outside the scope of an intellectual property exclusion like the one in the Union Policy. *See Minute Key, Inc. v. Charter Oak Fire Ins. Co.*, No. 16-cv-1850-JLK, 2017 WL 3584876, at *4 (D. Colo. August 11, 2017) (allegation in underlying complaint that insured sought to steal business from the underlying plaintiff by falsely accusing it of patent infringement was not an allegation of patent infringement and was outside the scope of the intellectual property exclusion); *Hartford Fire Ins. Co. v. Vita Craft Corp.*, 911 F.Supp.2d 1164, 1180 (D. Kan. 2012) (allegation in underlying complaint asserting that the insured spread false rumors about the underlying plaintiff's licensee were not tied to intellectual property rights, and the intellectual property exclusion did not bar coverage); *Align Tech., Inc. v. Fed. Ins. Co.*, 673 F.Supp.2d 957, 972 (N.D. Cal. 2009) (allegation in underlying counterclaim of insured company's suit for misappropriation of trade secrets that accused insured of making false promises to prospective employees, insinuating that former executives breached non-competition agreements, maligning management, recruiting its entire sales force, and unlawfully soliciting its employees did not bear any relation to parties' intellectual property dispute, and the intellectual property exclusion did not apply). Porters's allegations did not show that the Sprint Lumber Parties' conspiracy to breach the duty of loyalty and/or to tortiously interfere with Porters's customer relationships by disparaging Porters unequivocally and without exception arose out of the infringement of Porters's trade secrets or other intellectual property.

Likewise, Union failed to demonstrate that the exclusion for the access or disclosure of confidential information barred coverage for disparagement. Again, Porters's allegations did not show that the Sprint Lumber Parties' conduct involving disparagement of Porters necessarily arose out of any access to or disclosure of Porters's confidential or personal information.

Even if one or both exclusions excluded coverage for Porters's injuries arising out of misappropriation and access and disclosure of its confidential information and trade secrets, there was a possibility of coverage for its injuries arising out the independent and distinct causes relating to the disparagement of its services not excluded under the Policy. "Missouri recognizes the concurrent proximate cause rule when determining whether an exclusion provision in an insurance policy excludes coverage for an injury when that injury has two concurrent proximate causes, one covered by the policy and one excluded." *Adams v. Certain Underwriters at Lloyd's of London*, 589 S.W.3d 15, 29 (Mo. App. E.D. 2019). "If the included cause is truly independent and distinct from the excluded cause, then coverage will be found under the policy." *Id.*

Porters alleged various wrongful conduct by the Sprint Lumber Parties. Porters's claims for breach of duty of loyalty and for tortious interference with customer relationships by disparagement of Porters were independent and distinct from Porters's claims of misappropriation and access and disclosure of its confidential information and trade secrets. The claims for breach of duty of loyalty and for tortious interference by disparagement did not require proof of any of the elements of the claims involving confidential information and trade secrets. Union failed in its burden to prove there was no possibility of coverage for Porters's injuries under the exclusions.

Point two of Union's cross-appeal is denied.

**Duty to Indemnify**

In points three and four, Union contends that the trial court erred in entering judgment against it to indemnify for the settlement reached in the Underlying Suit. It asserts that there cannot be a duty to indemnify where there was no duty to defend for the reasons asserted in points one and two.

"Missouri law is clear that where there is no duty to defend, there is no duty to indemnify." *View Home Owner's Assoc. v. The Burlington Ins. Co.*, 552 S.W.3d 726, 732-33 (Mo. App. W.D. 2018) (internal quotes and citation omitted). As noted above, the duty to defend and the duty to indemnify are separate and distinct. *Allen,* 436 S.W.3d at 552; *Arch Ins. Co. v. Sunset Fin. Servs., Inc.*, 475 S.W.3d 730, 733 (Mo. App. W.D. 2015). "An insurer may have a duty to defend claims falling within the policy even if it may not ultimately be obligated to indemnify the insured." *Arch Ins.*, 475 S.W.3d at 733 (internal quotes and citation omitted). "The duty to defend arises from the potential liability to pay based on the facts as they appear at the outset of the case." *Id.* (citing *McCormack*, 989 S.W.2d at 170). On the other hand, "[t]he duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement." *McCormack*, 989 S.W.2d at 173. If relevant evidence adduced at trial contradicts or adds facts necessarily indicating the absence of coverage, then the insurer has no duty to indemnify the insured. *Arch Ins.*, 475 S.W.3d at 734.

Here, the trial court entered partial summary judgment finding that Union had a duty to defend. It found, however, that the summary judgment record was insufficient on the question of Union's duty to indemnify and conducted a bench trial on that issue (along with damages). Union does not challenge or dispute the trial court's findings of fact supporting the existence of

22

coverage under the Policy and the duty to indemnify in these points. Its only argument is that because it did not have a duty to defend as argued in points one and two above, it did not have a duty to indemnify. As discussed above, however, the trial court did not err in granting partial summary judgment finding that Union had a duty to defend, therefore, Union's arguments in points three and four regarding its duty to indemnify are meritless.

Points three and four of Union's cross-appeal are denied.

In an alternative argument to points three and four, Union contends in point five that the trial court erred in entering judgment against it to indemnify for the settlement reached in the Underlying Suit because the exclusions for Infringement of Copyright, Patent, Trademark, or Trade Secret and Access or Disclosure of Confidential or Personal Information applied to the entire settlement. Specifically, it argues that even if it had a duty to defend, the trial court misapplied the law in finding that it had a duty to indemnify because all of the damages claimed, including any for disparagement, violation of privacy, and use of advertising ideas, were interdependent and caused by the Sprint Lumber Parties' unlawful misappropriation and access and disclosure of confidential and private company information, customer contacts, lists, and trade secrets, which were excluded from coverage for "personal and advertising injury" by the exclusions.

Sufficient evidence at trial established Union's duty to indemnify. Specifically, the evidence demonstrated that the Sprint Lumber Parties conspired to breach their duty of loyalty and to tortiously interfere with Porters's customer relationships by disparaging Porters and that Porters's damages from that conduct was independently sufficient to support coverage for the entire $775,000 settlement paid to Porters to settle the Underlying Suit.

23

Former Porters employees, Downey, Reynolds, and Hidgon, testified at the bench trial. Before leaving Porters, Downey was the manager of its Elwood, Kansas location, and Reynolds and Higdon were salespeople at the location working with building contractors. They testified that they became dissatisfied with Alex Porter, the owner's son, when he took over the business, specifically the manner in which he was running the business and the direction he wanted to take it, leaning to the retail side. They stated that before they left their employment with Porters to go to work for Sprint Lumber in the spring of 2016, they contacted their customers in person or by email about moving their business to Sprint Lumber and gave them credit applications for Sprint Lumber. They told their customers that they believed Sprint Lumber was a better opportunity for themselves and their customers and that they would be able to service or take care of them better at Sprint Lumber because Sprint Lumber was more contractor-oriented. While such statements merely compared Sprint Lumber's service to Porters's service, other statements by Downey, Reynolds, and Higdon to customers disparaged Porters. For instance, their solicitation of Porters's customers included criticisms about Porters's management and its decision about services. It also included criticism about Porters's ability to service its contractor customers and to stay in business once Downey, Reynolds, and Higdon left Porters. Downey specifically told one customer that Porters's owner and his son were "not capable" of running the Elwood location without them. All testified that they understood what they were saying to the customers was disparaging to Porters. Reynolds testified that he knew that sending his customers credit applications for Sprint Lumber while working for Porters could cause the customers to view Porters negatively. The testimony of Downey, Reynolds, and Higdon demonstrated that their statements to Porters's customers while still employed at Porters (and after) disparaged Porters's service.

24

Additionally, the settlement agreement between the Sprint Lumber Parties and Porters from the Underlying Suit, admitted into evidence at the bench trial, further established Union's duty to indemnify the Sprint Lumber Parties for their settlement with Porters for their conspiracy to breach the duty of loyalty and to interfere with Porters's customer relationships by disparaging Porters. The Settlement Agreement contained a section entitled "Basis for Settlement," which provided, in pertinent part:

> This AGREEMENT and the amount the DEFENDANT SETTLING PARTIES (defined below) are paying in accordance with this AGREEMENT are based upon the following claims and allegations by PORTERS any or more of which, acting independently, gave rise to this AGREEMENT and the total amount paid under this AGREEMENT:

> (1) That DOWNEY, HIGDON, REYNOLDS, and MENG, with the cooperation, aid and encouragement of SPRINT and LADEROUTE, tortiously interfered with the relationships PORTERS had with its customers, including thirty-one specifically identified customers, by disparaging PORTERS' goods, products and services so as to cause the customers to lose goodwill for PORTERS and to either terminate their relationship with PORTERS or significantly reduce purchases from PORTERS;

> (2) That DOWNEY, HIGDON, REYNOLDS, and MENG, with the cooperation, aid and encouragement of SPRINT and LADEROUTE, breached their duty of loyalty to PORTERS by disparaging PORTERS' goods, products and services so as to cause PORTERS' customers to lose goodwill for PORTERS and to either terminate their relationship with PORTERS or significantly reduce purchases from PORTERS;

The agreement included two additional bases for the settlement—Sprint Lumber Parties' breach of their duty of loyalty to Porters by providing Sprint Lumber and Lauderoute with Porters's confidential advertising ideas and by communicating to Sprint Lumber and Lauderoute confidential and trade secret information in which Porters had a right to privacy. The settlement agreement clearly provided that each of the bases was independent and distinct and that each, on its own, supported the total amount paid under the settlement.

25

In Missouri, "[w]here one is bound to protect another from liability, [it] is bound by the result of the litigation to which such other is a party, provided [it] had opportunity to control and manage it." *Schmitz v. Great Am. Assurance Co.*, 337 S.W.3d 700, 709 (Mo. banc 2011) (internal quotes and citation omitted). "Once an insurer unjustifiably refuses to defend or provide coverage, the insured may, without the insurer's consent, enter an agreement with the plaintiff to limit its liability to its insurance policies." *Id.* at 710. "The insurer cannot have its cake and eat it too by both refusing coverage and at the same time continuing to control the terms of settlement in defense of an action it had refused to defend." *Id.* (internal quotes and citation omitted).

After Union refused to defend the Sprint Lumber Parties and pay Porters's settlement demand, they were free to, and did, execute a settlement agreement with Porters. Each admitted that the settlement was based in part on the claims and allegations regarding their disparagement of Porters's goods, product, and services. The trial court made several findings of fact about the settlement agreement that Union does not challenge on appeal. It found that the Policy provided coverage for each of the stated bases for the agreement. It found that the parties to the settlement agreement were all represented by counsel in the Underlying Suit who were familiar with the facts of that case and the risks of proceeding to trial. It found that the settlement agreement was not the product of collusion between the parties to the agreement, and the agreement was reasonable. Finally, it found that "[t]he allocation set forth in the 'Basis for Settlement' portion of the settlement agreement is reasonable and is supported by the facts of [the Sprint Lumber Parties'] conduct." The settlement agreement and the admissions of the Sprint Lumber Parties therein further established Union's duty to indemnify. *See Kirk King, King Constr., Inc. v. Cont'l W. Ins. Co.*, 123 S.W.3d 259, 266 (Mo. App. W.D. 2003) (settlement agreement between

26

underlying plaintiff and insured requiring insured to pay damages for building a home in violation of underlying plaintiff's copyright, which was committed as part of the insured's advertising, established insurer's duty to indemnify under advertising injury coverage of insurance policy).

In making its argument under this point, Union does not challenge the evidentiary record from the bench trial. "The duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement." *McCormack*, 989 S.W.2d at 173. Union argues, "If Downey, Higdon, and Reynolds 'disparaged' Porters's products, goods, and services…they did so by using protected, confidential information and trade secrets in soliciting customers whose identity was also protected and confidential. These facts fall squarely within the Union policy's access or disclosure or confidential and personal information and the infringement of trade secret exclusions." It further argues that "all of the damages claimed by Porters were traceable to and caused by the wrongful acts of its former employees in taking and misappropriating confidential and protected private company information, customer contacts, lists and trade secrets." Union, however, provides no evidentiary support for its argument. Instead, the evidence at trial revealed that Downey, Higdon, and Reynolds had long-term relationships with their customers and knew their identities and how to contact them without resorting to Porters's customers lists or other information. Union does not cite to any evidence establishing that the customer identities and contact information were confidential or trade secrets or that Downey, Higdon, and Reynolds actually used Porters's information or trade secrets to disparage Porters.

As explained in point two above, the concurrent proximate cause rule supported the trial court's judgment even if the exclusions at issue applied to exclude coverage for Porters's

27

injuries, which we need not decide. The exclusions do not exclude coverage for injuries caused by the disparagement of Porters's goods, products, or services. Even if the exclusions operated to exclude coverage for the disclosure and use of trade secrets or confidential information, coverage still existed for the disparagement, an independent and distinct cause. *Adams v. Certain Underwriters at Lloyd's of London*, 589 S.W.3d 15, 29 (Mo. App. E.D. 2019). The trial court did not err in entering judgment against Union to indemnify the settlement reached in the Underlying Suit.

Point five of Union's cross-appeal is denied.

## SPRINT LUMBER PARTIES' APPEAL

The Sprint Lumber Parties raise three points on appeal. In their first point, they challenge the trial court's grant of summary judgment in favor of Union on Count III of their second amended petition claiming breach of fiduciary duty. In point two, the Sprint Lumber Parties challenge the trial court's calculation of the statutory penalty for Union's violation of sections 375.296 and 375.420, RSMo 2016. Finally, in point three, they challenge the trial court's calculation of damages for Union's breach of its duty to defend.

### Summary Judgment on Breach of Fiduciary Duty Claim

In their first point on appeal, the Sprint Lumber Parties contend that the trial court erred in granting summary judgment in favor of Union on Count III of their second amended petition for breach of fiduciary duty. They argue that there are genuine issues of material fact and Union was not entitled to judgment as a matter of law because (1) a liability insurer's undertaking to defend an insured is not a condition precedent or a prerequisite to the existence of fiduciary duties on the part of the insurer; (2) Union had a fiduciary relationship with the Sprint Lumber Parties that began when the Policy was issued; and (3) the labeling of Count III is not

28

determinative and the facts alleged support a claim for bad faith failure to defend and bad faith failure to settle and Union did not establish that it was entitled to summary judgment on those viable theories.[6]

As noted above, appellate review of the grant of summary judgment is *de novo*. *Green*, 606 S.W.3d at 115. Summary judgment is proper if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.*

An insurer may commit an actionable breach of fiduciary duty even if it fails to fulfill its contractual obligation to assume an insured's defense. Thus, in *Shobe v. Kelly*, 279 S.W.3d 203, 208 (Mo. App. W.D. 2009), an insured sued the insurer for bad faith failure to settle. Under that tort, an insurer under a liability policy has a fiduciary duty to its insured to evaluate and negotiate third-party claims in good faith. *Id.* at 209. Where the insurer wrongfully breaches this duty and refuses to settle within policy limits, the insurer may be held liable for resulting losses to the insured. *Id.* The insurer in *Shobe* never provided a defense to the insured, even under a reservation of rights. *Id.* at 210. This court found that if an insurer wrongly denies coverage, denies even a defense under a reservation of rights, and then completely refuses to engage in settlement negotiations, it cannot avoid liability for bad faith failure to settle by its wrongful refusal to assume control of the proceedings. *Id.* at 211. Other decisions similarly recognize that a claim for bad faith failure to settle derives from the fiduciary duty created by the insurer's right

---

[6] Although the Sprint Lumber Parties contend in their point relied on that there are material facts in dispute, they do not identify any in their argument. The only citation to the record they make is to their second amended petition. Additionally, the reasons cited in their point relied on are legal, not factual. As there are no issues of fact in dispute, the only issue for review is whether Union was entitled to judgment as a matter of law.

to control the defense or settlement of claims against the insured.[7]

Count III of the Sprint Lumber Parties' petition alleged that Union had breached its fiduciary duties by failing to act in good faith to defend and settle claims against the Sprint Lumber Parties. Even if the Sprint Lumber Parties were wrong to label Count III as a claim for breach of fiduciary duty, the label they placed on the claim would not be controlling.

"[T]he rule is well established in Missouri that the character of a cause of action is determined from the facts stated in the petition and not by the prayer or name given the action by the pleader." *Am. Eagle Waste Indus., LLC v. St. Louis Co.*, 379 S.W.3d 813, 829 (Mo. banc 2012) (internal quotes and citation omitted). To determine the cause of action, the facts stated in the petition along with the relief sought are considered rather than the form of the petition. *Id.* "To be deemed sufficient, a petition need not even label the theory upon which a plaintiff seeks recovery." *Id.* The question, therefore, is did the Sprint Lumber Parties' petition invoke claims of bad faith failure to defend and to settle and inform Union of what they would attempt to establish at trial. *Id.*

---

[7]    An insurer's right to control settlement and litigation under a liability insurance policy creates a fiduciary relationship between insurer and insured. Thus, an insurer owes a duty to exercise good faith in evaluating and negotiating third-party claims against its insured, and the insurer may be held liable in tort for a third-party judgment in excess of policy limits if it fails to perform its fiduciary obligation in good faith. It is the existence of this fiduciary relationship between insurer and insured, aside from insurer's subsisting implied covenant of good faith and fair dealing under the insurance policy, that exposes an insurer to tort liability for failing to exercise good faith in evaluating and negotiating third-party claims against an insured.

*Freeman v. Leader Nat'l Ins. Co.*, 58 S.W.3d 590, 598 (Mo. App. E.D. 2001) (citing *Duncan v. Andrew Cnty. Mut. Ins. Co.*, 665 S.W.2d 13, 18 (Mo. App. W.D.1983)). *See also Rock Port Market, Inc. v. Affiliated Foods Midwest Coop., Inc.*, 532 S.W.3d 180, 188-89 (Mo. App. W.D. 2017) (tort of bad faith failure to settle arises where policy gives insurer "the absolute authority to evaluate and settle third-party claims against the insured," and the insured is accordingly "subservient to the dominance of the insurer to settle a third-party claim"); *Dairy Farmers of Am., Inc. v. Travelers Ins. Co.*, 292 F.3d 567, 573 (8th Cir. 2002) (Missouri law).

An insurer's wrongful failure to defend constitutes a breach of contract. *Adams v. Certain Underwriters at Lloyd's of London*, 589 S.W.3d 15, 38 (Mo. App. E.D. 2019). If an insurer wrongfully refuses to defend, it is liable to the limits of its policy plus attorney fees, expenses and other damages. *Allen v. Bryers*, 512 S.W.3d 17, 38 (Mo. banc 2016). "This is true even though the company acts in good faith and has reasonable grounds to believe there is no coverage under the policy." *Id.* at 38-39 (internal quotes and citation omitted). However, if an insurer acts in bad faith in refusing to defend, it is liable for the entire amount of an underlying judgment beyond policy limits. *Id.* (noting that in *Columbia Casualty Company v. HIAR Holding, L.L.C.,* 411 S.W.3d 258 (Mo. banc 2013), "because the insurer acted in bad faith for refusing both to defend and to settle, the insurer was liable for the entire amount of the judgment beyond the policy limits.").

In addition to a duty to defend, inherent in an insurance policy is the insurer's obligation to act in good faith regarding the settlement of a claim. *Advantage Bldgs. & Exteriors, Inc. v. Mid-Continent Cas. Co.*, 449 S.W.3d 16, 24-25 (Mo. App. W.D. 2014). "A claim for bad-faith failure to settle 'is a tort action based on the insurer's failure to protect the interests of its insured.'" *Id.* (quoting *Shobe*, 279 S.W.3d at 212). Its elements are:

> (1) the liability insurer has assumed control over negotiation, settlement, and legal proceedings brought against the insured; (2) the insured has demanded that the insurer settle the claim brought against the insured; (3) the insurer refuses to settle the claim within the liability limits of the policy; and (4) in so refusing, the insurer acts in bad faith, rather than negligently.

*Id.* at 25 (internal quotes and citation omitted). But as discussed above, where an insurer wrongly denies coverage, refuses to defend, and then refuses to engage in settlement negotiations, an insurer cannot avoid liability for bad faith failure to settle by its wrongful refusal to assume control of the proceedings. *Shobe*, 279 S.W.3d at 211. *See also Truck Ins. Exch. v.*

31

*Prairie Framing, LLC*, 162 S.W.3d 64, 94 (Mo. App. W.D. 2005) (The "obligation to act in good faith regarding settlement continues even if an insurer denies coverage and refuses to defend the insured.").

Bad faith requires more than erroneous denial of coverage. *Bryers*, 512 S.W.3d at 39; *Shobe*, 279 S.W.3d at 211-12. Bad faith is "the intentional disregard of the financial interest of the insured in the hope of escaping the responsibility imposed upon the insurer by its policy." *Allen*, 512 S.W.3d at 39 (internal quotes and citation omitted). An insurer cannot protect its interests to the detriment of the insured's but must sacrifice its interests in favor of those of the insured. *Advantage Bldgs.,* 449 S.W.3d at 25. Examples of bad faith include failing to investigate fully a third-party claimant's injuries or recognize their severity; ignoring that a verdict could exceed policy limits; refusing to consider a settlement offer; and not keeping an insured informed of settlement offers or the risks of an excess judgment. *Bryers*, 512 S.W.3d at 39; *Shobe*, 279 S.W.3d at 211. "Limiting an investigation to the question of coverage, then standing on a denial without considering the interests of an insured also shows bad faith." *Shobe*, 279 S.W.3d at 211.

The Sprint Lumber Parties' second amended petition against Union asserted facts that supported claims for bad faith failure to defend and bad faith failure to settle. It alleged facts showing coverage under the Policy. It alleged that Union had an exclusive right to defend the Sprint Lumber Parties and to settle a claim. It alleged that Union repeatedly failed to investigate the claim and that it repeatedly refused to defend the Sprint Lumber Parties. It alleged that Union offered to defend under a reservation of rights at a later date, which the Sprint Lumber Parties rejected. It alleged that Porters submitted a settlement demand, that the Sprint Lumber Parties asked Union to pay the demand, that Union refused to do so, and that the Sprint Lumber

32

Parties were forced to enter into a settlement agreement with Porters to eliminate their financial risks. Count III, which incorporated the above allegations, specifically alleged that Union's refusal to defend the Sprint Lumber Parties in the Underlying Suit and to pay Porters to settle was "without reasonable and sufficient justification, was in bad faith and was vexatious." It alleged that Union placed its financial interests above those of the Sprint Lumber Parties. Finally, it alleged that Union acted with reckless indifference to and conscious disregard of the Sprint Lumber Parties' rights.

Union's summary judgment pleadings regarding Count III did not demonstrate that the Sprint Lumber Parties' allegations were without factual support or that there was no genuine issue of material fact as to whether Union acted in bad faith in refusing to defend and to settle. In fact, after the bench trial, the trial court made findings of fact regarding Union's bad faith, including that Union's investigation was wholly inadequate and cursory, that its investigation was limited to a review of Porters's pleadings and the policy and started with a presumption of no coverage, and that Union's attitude in handling the claim was vexatious, recalcitrant, and without reasonable cause or excuse from the time the claim was opened through trial.

The Sprint Lumber Parties' second amended petition supported claims for bad faith failure to defend and failure to settle. Union failed to show that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law on those viable theories. The trial court, therefore, erred in granting summary judgment in favor of Union on Count III of the Sprint Lumber Parties' second amended petition. The summary judgment on Count III is reversed, and the case is remanded to the trial court for further proceedings on the Sprint Lumber Parties' claims for bad faith failure to defend and to settle.

Point one of the Sprint Lumber Parties' appeal is granted.

33

**Statutory Penalty for Vexatious Refusal to Pay**

In point two, the Sprint Lumber Parties contend that the trial court erred in calculating the statutory penalty for Union's violation of sections 375.296 and 375.420, RSMo 2016. They argue that the trial court erroneously declared or applied the law in determining that the "amount of loss" from which the statutory penalty was calculated included only the settlement amount of $775,000 and not the attorney fees and expenses paid by Sprint Lumber and Lauderoute to defend the Sprint Lumber Parties in the Underlying Suit.

In its judgment, the trial court stated:

The Court concludes that Sprint Lumber and Laderoute are jointly entitled to $77,500 from [Union] as a penalty under the vexatious refusal statutes for [Union's] failure to pay Sprint Lumber and Laderoute the $775,000 paid to Porters to settle the Underlying Suit. While the Court believes the entirety of [Union's] conduct was vexatious, including their failure to defend, the Court believes it is constrained by Missouri law to limit its application of the penalty to only the amount of the settlement. In addition, under the vexatious refusal statutes, Sprint Lumber and Laderoute are entitled to reasonable attorney fees from [Union] in the amount of $193,841, which have been incurred in pursuing the above-captioned case.

"Sections 375.296 and 375.420 allow penalties to be assessed against an insurer when it refuses to make payment, upon demand and in accordance with the policy, vexatiously, willfully and without reasonable cause." *Nooter Corp. v. Allianz Underwriters Ins. Co.*, 536 S.W.3d 251, 294 (Mo. App. E.D. 2017) (internal quotes and citation omitted). Section 375.296 provides:

In any action, suit or other proceeding instituted against any insurance company, association or other insurer upon any contract of insurance issued or delivered in this state to a resident of this state, or to a corporation incorporated in or authorized to do business in this state, if the insurer has failed or refused for a period of thirty days after due demand thereof prior to the institution of the action, suit or proceeding, to make payment under and in accordance with the terms and provisions of the contract of insurance, and it shall appear from the evidence that the refusal was vexatious and without reasonable cause, the court or jury may, in addition to the amount due under the provisions of the contract of insurance and interest therein, allow the plaintiff damages for vexatious refusal to pay and

34

attorney's fees as provided in section 375.420. Failure of an insurer to appear and defend any action, suit or other proceeding shall be deemed prima facie evidence that its failure to make payment was vexatious without reasonable cause.

Section 375.420 provides:

In any action against any insurance company to recover the amount of any loss under a policy of automobile, fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance except automobile liability insurance, if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict.

Courts construe Section 375.420 permitting penalties against an insurer for its vexatious refusal to pay strictly, because it is penal in nature. *Thornburgh Insulation, Inc. v. J.W. Terrill, Inc.*, 236 S.W.3d 651, 657 (Mo. App. E.D. 2007). *See also Legg v. Certain Underwriters at Lloyd's of London*, 18 S.W.3d 379, 387 (Mo. App. W.D. 1999); *State ex rel. Webb v. Hartford Cas. Ins. Co.*, 956 S.W.2d 272, 276 (Mo. App. W.D. 1997).

The Sprint Lumber Parties argue that that the "amount of loss," from which the statutory penalty is calculated, should not only include the loss Union was obligated to indemnify, but also include the measure of damages the Sprint Lumber Parties are entitled due to Union's breach of its duty to defend. Specifically, they assert that the "loss" used to calculate the penalty includes not only the settlement amount for Porters's losses, but also includes the Sprint Lumber Parties' damages resulting from Union's breach of its duty to defend, including their attorney fees and expenses to defend the Underlying Suit.

The plain language of section 375.420, however, defies such interpretation. In the statute, "loss" is modified or described by the adjective prepositional phrase "under a policy."

35

Loss under an insurance policy is that for which the policy insures or covers. Third-party indemnity coverage, such as in this case, "insures the insured's liability for losses which third parties suffer on account of the insured's actions." *Truman Med. Ctr., Inc. v. Progressive Cas. Ins. Co.*, 597 S.W.3d 362, 368 (Mo. App. W.D. 2020). In this case, Coverage B of the Policy provided coverage for personal and advertising injury liability: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." Per the settlement agreement, the Sprint Lumber Parties became legally obligated to pay $775,000 as damages for losses suffered by Porters for personal and advertising injury. In turn, Union was obligated under its coverage to indemnify The Sprint Lumber Parties for those losses suffered by Porters.

Sections 375.296 and 375.420 impose the penalty where an insurer vexatiously refuses to pay its own first party insured's casualty losses; and also where (as in this matter) an insurer vexatiously refuses to pay the third party loss it was obligated to pay (for its insured) under a policy of indemnity. In either instance, the "loss" upon which the penalty is measured is the "loss" which is covered "under the policy." § 375.420. Sprint conflates the indemnity insurer's obligation to pay covered losses (under its policy of indemnity) with its obligation to provide a defense (and the resulting damages it may be obligated to pay its insured because it violated its duty to provide a defense). The triggering event for the penalty is vexatious refusal "to make payment" under Section 375.296—not a breach of other duties (like the duty to defend).

36

Similarly, in Section 375.420, it is the insurer's "refus[al] to pay such loss without reasonable cause or excuse" that allows the court or jury to assess the penalty—not the failure to defend.[8]

The trial court did not erroneously declare or apply the law in determining that the "amount of loss" from which the statutory penalty was calculated for vexatious refusal to pay included only the settlement amount of $775,000 (for Porters's losses) and not the attorney fees and expenses paid by Sprint Lumber and Lauderoute to defend the Sprint Lumber Parties in the Underlying Suit.

Point two of the Sprint Lumber Parties' appeal is denied.

## Damages for Breach of Duty to Defend

In their final point on appeal, the Sprint Lumber Parties contend that the trial court erred in calculating damages recoverable from Union's breach of the duty to defend. They argue that the trial court erroneously declared or applied the law in only awarding Sprint Lumber and Lauderoute damages for attorney fees and expenses incurred for legal work done after June 13, 2016, the date of Union's first disclaimer letter. They assert that Sprint Lumber and Lauderoute were entitled to recover all the attorney fees and expenses they paid to defend the Sprint Lumber Parties against the Underlying Suit, including an additional $19,000.44 in attorney fees and expenses they paid for work done from May 9, 2016 to June 13, 2016.

Where an insurance company refuses to defend an insured who is in fact covered, it is liable to the limits of its policy plus attorney fees, expenses, and other damages incurred in defending the underlying action. *Allen v. Bryers*, 512 S.W.3d 17, 38 (Mo. banc 2016); *Landie v.*

---

[8] Even if the word "loss" in section 375.420 could also be interpreted expansively to include the damages the Sprint Lumber Parties suffered as a result of Union's failure to defend, the fact that section 375.420 is a penal statute, which must be interpreted strictly, would require us to adopt the narrower interpretation discussed in the text.

37

*Century Indem. Co.*, 390 S.W.2d 558, 562 (Mo. App. 1965). An insurer, however, has no duty to pay for fees incurred prior to the insured's demand for coverage. *Monsanto Co. v. Gould Elecs., Inc.*, 965 S.W.2d 314, 318 (Mo. App. E.D. 1998) ("indemnitee has the right to recover attorney's fees reasonably incurred in the defense of a claim, provided the indemnitor has notice of the law suit and an opportunity to defend."). *See also Cincinnati Ins. Co. v. Mo. Highways & Transp. Comm'n*, No. 4:12-cv-01484-NKL, 2014 WL 7330980, *1 (W.D. Mo. Dec. 19, 2014) (applying Missouri law, insurer must compensate insured for its attorney fees incurred in defense of underlying action against insured from the date insured tendered demand for defense).

The Sprint Lumber Parties gave Union notice of its claim on May 17, 2016. Sprint Lumber and Laderoute were entitled to reasonable attorney fees and expenses they incurred to defend the Sprint Lumber Parties in the Underlying Suit from that date. The trial court erred in limiting its award for Sprint Lumber's and Laderoute's damages for attorney fees and expenses incurred to legal work done after June 13, 2016 (the date of Union's first disclaimer letter). That part of the trial court's judgment is reversed, and the case is remanded to the trial court to award reasonable attorney fees and expenses incurred by Sprint Lumber and Laderoute in defending the Sprint Lumber Parties in the Underlying Suit from May 17, 2016 (the date Union was notified of the claim for coverage).

Point three of the Sprint Lumber Parties' appeal is granted.

**ATTORNEY FEES ON APPEAL**

Before submission of this case, the Sprint Lumber Parties filed a motion for attorney fees on appeal with this court under sections 375.296 and 375.420. The motion was taken with the case.

Under this court's Special Rule 29, a party may file a motion for attorneys' fees on appeal "pursuant to contract, statute or otherwise." A court may award reasonable attorney fees where an insured prevails against an insurance company for vexatious refusal to pay under section 375.420. *Nooter Corp. v. Allianz Underwriters Ins. Co.*, 536 S.W.3d 251, 300 (Mo. App. E.D. 2017). This includes appeals involving claims of an insurer's vexatious refusal to pay. *Id.* "[R]efusing to compensate an attorney for time reasonably spent on appellate work defending the judgment below would be inconsistent with the legislative intent to provide for recovery of said fees." *Merseal v. Farm Bureau Town & Country Ins. Co.*, 396 S.W.3d 467, 475 (Mo. App. E.D. 2013).

Union's denial of the Sprint Lumber Parties' claim and its position in the proceeding below were based on its argument that it did not have a duty to defend or indemnify the Sprint Lumber Parties for the Underlying Suit under the Policy. The trial court found against Union on these issues and further concluded, "Union's handling of the claim at issue, and its refusal to pay Sprint Lumber and Laderoute the amount they paid to Porters to settle the Underlying Suit, is vexatious and without reasonable cause or excuse….Union's attitude, at all relevant times, has been vexatious and recalcitrant."

Both parties appealed in this case. In Union's appeal, it continues to deny a duty to defend or indemnify. It does not directly challenge the trial court's determination that it acted vexatiously and without reasonable cause or excuse. In denying that the Sprint Lumber Parties are entitled to attorney fees on appeal under section 375.420, Union continues to argue that there was never a duty to defend or indemnify and thus no claim for vexatious refusal to pay.

"The entitlement to attorneys' fees on appeal stands upon the same ground as that at the trial court level." *Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 402 (Mo.

App. E.D. 2007) (internal quotes and citation omitted). Because we affirm the trial court's judgment ruling in favor of the Sprint Lumber Parties on their action against Union to recover the amount of their loss under the Policy (the $775,000 settlement with Porters) under section 375.420, the Sprint Lumber Parties' request for attorney fees on appeal is granted. "While appellate courts have the authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Berry v. Volkswagen Grp. of Am., Inc.*, 397 S.W.3d 425, 433 (Mo. banc 2013) (internal quotes and citation omitted). The case is remanded, therefore, to the trial court to award reasonable attorney fees to the Sprint Lumber Parties for their defense of Union's appeal.

## CONCLUSION

The trial court's partial summary judgment in favor of the Sprint Lumber Parties finding Union had a duty to defend and its judgment against Union to indemnify the Sprint Lumber Parties is affirmed, except that its award of attorney fees and expenses for Union's breach of its duty to defend is reversed and remanded. The trial court's summary judgment in favor of Union on the Sprint Lumber Parties' Count III of their second amended petition is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion and to award attorney fees to the Sprint Lumber Parties for their defense of Union's appeal. The judgment is affirmed in all other respects.

/s/ *Thomas N. Chapman*
Thomas N. Chapman, Judge

All concur.

40